PER CURIAM.
This appeal arises from a tax appeal filed with the Middlesex County Tax Board from the 1998, 1999, 2000 and 2001 tax assessments applied to certain structures located on a farm in Monroe Township owned by William and Marie Gasko, hereinafter referred to as the Gasko Farm. The tax assessor’s assessment of the value of the structures was not based upon a farmland assessed valuation. The Tax Board determined that the structures qualified for farmland assessment valuation pursuant to N.J.S.A. 54:4-23.12(a). On the Township’s appeal to the Tax Court, the Tax Court held that the structures did not qualify for such valuation. We affirm.
The seventy-one acre Gasko Farm at one time was operated as a truck farm, growing fruits and vegetables. In the 1990’s, the farm turned entirely to the production of sale of nursery produce. To implement that change in direction, seven structures were erected on the property, all characterized as “greenhouses.” They are all involved in the growth and production of nursery stock, primarily seasonal flowers and plants. The first-stage propagation is performed in a structure not at issue here. Later stages of growth occur in five other structures. It is these structures which are the subject of this appeal. They have been designated during this appeal as: (1) greenhouse 1, a 144-foot by 294-foot structure, (2) greenhouse 3, a 105-foot by 206-foot structure, (3) greenhouse 4, a 84-foot by 206-foot structure, (4) greenhouse 5, a 90-foot by 206-foot structure, and, (5) greenhouse 6, a 180-foot by 305-foot structure.
*394 All of these greenhouses are used in the growth and production of the nursery stock. They also are an integral part of the farm’s retail sales and marketing. The Tax Court Judge described the structures and his rationale thusly:
I have concluded that growing and marketing takes place in all of the buildings. By marketing, I mean the customers view and select product in those buildings.
However, the intensity of those activities varies between Building Number 1 on the one hand, and Buildings 3, 4, 5 and 6 on the other. Just to highlight the differences, in Building Number 1, there are cash registers, there are not in the other buildings. In Building Number 1, there are price signs, and there are not in the other buildings. Although figures are not precise, my conclusion that based on the testimony is that perhaps three-quarters of sales picked up and carried to the cash registers are picked up in Building Number 1, and less than one-quarter in the other building. This is accomplished — in the other buildings. — by fact that the stock in Building Number 1 is constantly being replenished.
The public is invited into both buildings. Mr. Peter Gasko testified that the principal reasons for inviting customers into Buildings 3 and 6 was that it whet their appetite. It got them to come to Gasko’s because of the beautiful display.
Mr. Alias and Ms. Williams (phonetics) from the Assessor’s Office in Monroe testified that there was no distinction in the activity in the two buildings.
Messrs. Wengrin (phonetic), from the New Jersey Farm Bureau, and Brock, from the New Jersey Department of Agriculture, testified as to the substantial differences in the activities in Buildings 1, on the one hand, and 3, 4, 5 and 6 on the other, and led them to conclude that either a part or all of Building Number 1 was devoted to selling and not qualified for the exemption of N.J.S.A. 54:4-23.12(a).
I have looked at photos in evidence of the greenhouses. And although the photographs depicted them when few or no customers were present, there is a definite difference in the appearance of Building Number 1 and Buildings 3 through 6.
Gasko’s is an integrated, propagator grower and retailer. And the question, in part, is are these — are there lines to be drawn in the physical operation which separates the place where the selling activities and growing activities take place. All parts of the farm, to some extent, are used in all activities.
I’ve concluded that Building 1 is selling space in which selling activity takes place____[Customers are invited in and freely circulate. Prices are posted. This is a retail, not a wholesale, activity. Cash and credit transactions take place.
Despite the fact that the facility is open to the public less than half of the year, despite the fact that plants are grown in the facility which are not sold from the facility, for example, the pansies, which are growing now and ultimately will be sold from the outside, Gasko’s is a retail operation and substantial amount of resale sales. But the [v]ast majority of retail sales, which take place out of the building, take place out of Building Number 1. They are picked in one and paid for in Building 1.
To isolate that portion of the building where the cash registers are located • approximately 500 square feet and say that that is the only sale space borders on the absurd.
*395 Display is an important part of sale space. Customers don’t stand at the cash registers and order plants to be brought to them. Statutes are to be read sensibly.
Making a determination with respect to Buildings Number 3 through Number 6 is not as easy. Although they are different in appearance and intensity of use from Building Number 1, although prices are not posted, customers are invited into these buildings to do more than browse. They are welcome to select and take plants, to ask Gasko family members to give them hanging plants which may not be as easily reached because of the height at which they’re hung and the fact that they’re hung on these elaborate conveyors, unlike the hanging baskets in Building Number 1. And a significant, though not the majority of sales, are selected and taken to the cash registers from buildings other than Building 1.
Farmland assessment, generally, is a favored tax treatment for land used for farmland operations. Indeed, the constitutional authorization for such reduced tax valuation focuses upon the use of the land, not the structures thereon. N.J. Const. Art. VIII, § 1. Application of that favored treatment, therefore, is the exception. Such exceptions are strictly construed. E.g., Princeton Univ. Press v. Bor. of Princeton, 35 N.J. 209, 214, 172 A.2d 420, 422-23 (1961). It is in this context that application of N.J.S.A. 54:4-23.12(a) to the Gasko Farm greenhouses must be considered.
N.J.S.A. 54:4-23.12(a) provides in relevant part:
All structures, which are located on land in agricultural or horticultural use and the farmhouse and the land on which the farmhouse is located, together with the additional land used in connection therewith, shall be valued, assessed and taxed by the same standards, methods and procedures as other taxable structures and other land in the taxing district, regardless of the fact that the land is being valued, assessed and taxed pursuant to P.L.1964, c. 48 (C. 54:4-23.1 et seq.); provided, however, that the term “structures” shall not include “single-use agricultural or horticultural facilities.” As used in this act, “single-use agricultural or horticultural facility” means property employed in farming operations and commonly used for either storage or growing, which is designed or constructed so as to be readily dismantled and is of a type which can be marketed or sold separately from the farmland and buildings and shall include, but not be limited to, temporary demountable plastic covered framework made up of portable parts with no permanent understructures or related apparatus, commonly known as seed starting plastic greenhouses, or other readily dismantled silos, greenhouses, grain bins, manure handling equipment, and impoundments, but shall not include a structure that encloses a space within its walls used for housing, shelter, or working, office or sales space, whether or not removable.
The legislative history of this exception to the general rule that structures on land valued as farmland are to be taxed by the same standards as other structures in the taxing district was thoroughly *396 analyzed in Van Wingerden v. Lafayette Tp., 18 N.J.Tax 81 (1999), aff'd, 335 N.J.Super. 560, 763 A.2d 294 (App.Div.2000) (Van Wingerden). There the Tax Court concluded that taxpayer’s greenhouse structures did qualify for farmland assessment under N.J.S.A. 54:4-23.12(a). The Tax Court Judge described the use of the structures thusly:
The main greenhouse is used for the growing of flowers, primarily roses, anthuriums, and snapdragons. An area within the main greenhouse, extending the entire width of the structure to a depth of approximately thirty feet from the common wall, is used for storage of equipment employed in the horticultural operations in the main greenhouse.
The shipping house contains the machinery and equipment used to operate the main greenhouse. This equipment includes boilers and pumps providing heat to the main greenhouse, a water tank, controls for the main greenhouse heat shield which deflects direct sunlight in the summer and provides insulation in the winter, controls which open and close glass panels in the roof of the main greenhouse to provide ventilation, and controls for a centralized watering system servicing the main greenhouse. Also located in the shipping house are: tables used to grade and sort flowers after they are harvested; a refrigerated cool box approximately 10 feet by 15 feet, and approximately 10 feet in height, which is used to store flowers after they have been graded and sorted; a desk approximately 3 feet by 5 feet with one chair; a cordless telephone; a small workbench; and a tool storage area. The desk is used only for limited paper work such as preparing a bill or invoice for a customer or writing down a telephone order. No office staff is located in the shipping house. The office facility for Mr. Van Wingerden’s horticultural business is located in his house, where he maintains his business records, tax records, and billing records, pays bills, and does bookkeeping. This office also contains filing cabinets, a computer, a copy machine, and other necessary business equipment.
As flowers mature they are cut, generally every morning. The cutting process involves use of a cart containing buckets of water. The cart is wheeled on the eight foot wide concrete walkway in the main greenhouse. As the flowers are cut, they are placed in the buckets. After the buckets are filled, the cart is returned to the shipping house where the flowers are graded and sorted on the tables described above, and then placed in bundles usually containing twenty-five flowers each. The bundles are placed in buckets containing a chemical preservative solution, and the buckets are placed in the cool house to await delivery to, or pickup by, customers. Mr. Van Wingerden sells primarily to florists and florist distributors. Florists within approximately thirty minutes driving distance generally come to the greenhouse to pick up their orders, and others receive deliveries from Mr. Van Wingerden. Some distributors pick up their orders from the greenhouse, and Mr. Van Wingerden delivers to others.
Mr. Van Wingerden makes no effort to encourage retail business. He does not advertise for such business, and neither the shipping house nor the main greenhouse contains an area for display of flowers. The driveway from Route 206 to the greenhouse is approximately 1,000 feet in length. The greenhouse is not visible from the highway, and no sign or advertising is located at or near Route 206 to attract customers onto the site. Retail sales constitute less than one percent of the *397 total business. Retail customers are generally Mends or acquaintances of Mr. Van Wingerden, and people who make deliveries to the premises.
No sales staff is employed at the greenhouse. When regular customers come to the greenhouse to pick up their orders, neither Mr. Van Wingerden nor any employee is needed to provide assistance. Mr. Van Wingerden writes the invoice for the particular florist or distributor, places it in a clipboard next to the door to the cool house, and places the order in a bucket or buckets with an identifying tag. The florist or florist distributor signs the invoice, retains one copy, then enters the cool house and removes the flowers that have been set aside for that order. The occasional retail customer must get the attention of someone working in the main greenhouse or shipping house in order to purchase flowers.
[18 N.J.Tax at 86-88.]
In considering whether these facts fit within the statute, the Van Wingerden tax judge focused upon the pertinent statutory language. He observed:
As set forth above, the initial portion of N.J.S.A. 54:4-23.12(a) provides for taxation of structures “located on land in agricultural or horticultural use,” but exempts “single-use agricultural or horticultural facilities,” which the statute defines as “property employed in farming operations and commonly used for either storage or growing, which is designed or constructed so as to be readily dismantled and is of a type which can be marketed or sold separately from the farmland and buildings.” The Farmland Assessment Act contains no definition of the terms “faming operations,” “storage” or “growing.” The architecture of N.J.S.A. 54:4-23.12(a), however, in effect defines “farming operations” as “agricultural or horticultural use” of land and buildings.
N.J.S.A. 54:4-23.2 defines “agricultural use” as devotion “to the production for sale of plants and animals useful to man____” N.J.S.A. 54:4-23.4 defines “horticultural use” as devotion “to the production for sale of fruits of all kinds, including grapes, nuts and berries; vegetables; nursery, floral, ornamental and greenhouse products; ____” N.J.A.C. 18:15 — 6.2(a)(1) defines the phrase “devoted to agricultural use” (see N.J.S.A. 54:4-23.5) as including land “[o]n which crops are grown for market, either retail or wholesale.” The inclusion of the phrases “production for sale” and “grown for market, either retail or wholesale” in these definitions indicates that an agricultural or horticultural use encompasses making crops ready for sale, including storage pending sale. Under N.J.S.A. 54:4-23.12(a), therefore, the sale in or from a structure, otherwise qualifying for exemption, of agricultural or horticultural crops does not, in itself, preclude qualification for exemption, and the structure will lose such qualification only if it encloses “sales space” within the meaning of the statute.
The statutory designation of specific structures as qualifying for exemption, and the designation of disqualifying “space” provide additional indications of legislative intent. The structures expressly qualifying for exemption, namely, “silos, greenhouses, grain bins, manure handling equipment, and impoundments,” are commonly used only for agricultural or horticultural purposes. The “space” enclosed by such a structure which the statute specifies as disqualifying the structure from exemption, namely, space used for “housing, shelter, or working, office or sales *398 space, ” is not used for a purpose or function inherent to an agricultural or horticultural use, but for a function or purpose only ancillary to such a use.
Based on the preceding discussion of the legislative history of L. 1993, c. 251 § 1, and the language of the statute, I conclude that the Legislature intended to provide property tax relief only for structures which can be readily dismantled, and which are integral to, and used entirely for, functions or purposes essential and inherent to the growing or storage of agricultural or horticultural crops. As discussed above, “growing or storage" includes making crops ready for sale. Making a crop ready for sale does not include altering the raw state of the crop by activities such as processing or transforming the crop into an end product, for example, baking apple pies, producing cranberry sauce or juice, or preparing floral displays. A structure used partially for functions or purposes not essential and inherent to the growing or storage of agricultural or horticultural crops is not “single-use," and, therefore, does not qualify for tax exemption.
[Id. at 90-91 (emphasis added).]
Because the judge in Van Wingerden concluded that the structures at issue there were used substantially for growing or storage of produce and that the “sales activity” was incidental, he reversed the denial of farmland assessment for those structures.
Here, the facts are quite distinct. As articulated by Judge Small:
I thus turn to a comparison of what was going on in Van Wingerden and what was going on in Building Number 1 at the Gasko facility and Buildings 3, 4, 5 and 6.
With regard to whether sales were wholesale or retail, Van Wingerden was almost exclusively wholesale. Gasko is almost exclusively retail in both buildings, although there is a small wholesale activity and a more prominent wholesale activity in the sale of poinsettias in the fall — the Christmas selling season.
Customers are invited into all of the facility. The record indicates that there was no advertising by Van Wingerden, there was mass general population advertising by Gasko with respect to both buildings.
Sales personnel were not in the Van Wingerden facility and they are in the Gasko facility, though to a lesser extent in Buildings 3, 4, 5 and 6. And sales personnel in those buildings are conducting other activities, as well.
The Court found it important to discuss in Van Wingerden that there were no signs and the property was not visible from the highway. Gasko is visible and there are signs.
Van Wingerden had no displays. Gasko’s has displayed, although indicated not at optimal level, the displays in Budding 1 are clearly set out to sell and the displays in Buddings 3, 4, 5 and 6 are advertised and are an attraction to the facility.
Growing and storage takes place in ad buddings of Van Wingerden and Gasko. One in Gasko 3 through 6.
Prices were not posted at Van Wingerden’s facility. Gasko Facility number 1 does not post prices. Facilities 3, 4, 5 and 6 do not.
*399 Customers select and carry goods to the retail counters in Gasko 1 and Gasko 3, 4, 5 and 6, but did not do so in Van Wingerden.
There is no evidence as to the ease of navigation around the greenhouses in Van Wingerden. It is clear that navigation is easier in Gasko Number 1, displays are designed for the people whereas in 3, 4, 5 and 6, depending on the time of year, navigation may be difficult in some parts as plants are laid out throughout the entire floor.
Could 3, 4, 5 and 6 be taxed differently than Building 1? Certainly. Principally by barring customers from entering the facility, but they were not so barred. And tax consequences must follow the actions, not what they might have been. And I cite to General Trading versus the Director [General Trading Co., Inc. v. Director, Div. of Taxation, 83 N.J. 122, 416 A.2d 37 (1980)1.
Mr. Gasko candidly testified that making displays available to customers encouraged them to come and implication to buy. It’s a huge and spectacular display. For the same reason that manufacturers and brewers open their plants to the public, Gasko’s opens their greenhouses. It’s a marketing or selling activity.
Clearly a major function is growing and storing, but it’s not exclusive and the Statute requires a more exclusive use of Buildings 3, 4, 5 and 6 than the Gasko’s use, which includes both display and availability of sale.
In May of 1999, just after Judge [Kuskin’s] decision in Van Wingerden, Mr. Robert Burke (phonetic) of the New Jersey Department of Agriculture, a witness in this case, opined that Building Number 1 was taxable, but that the other greenhouses were not.
His analysis and the factual basis of his findings are not as extensive, either by his testimony, or his letter, as the analysis of Judge [Kuskin’s] in Van Wingerden are my discussion of the facts in this case and I decline to follow his interpretation with respect to Buildings 3, 4, 5 and 6.
Similarly, Mr. Edward Wengrin (phonetic) of the New Jersey Farm Bureau felt that the only sale space was that area around the cash registers.
Both of these witnesses are employed by agencies, public or private, whose task is to aid farmers and they, thus, should be expected to lack complete objectivity in their conclusions with regards to which building are exempt. Their analysis was more on the line of a commonsense analysis rather than a strict legal analysis, not to say that the law does not embody common sense, but strict lines are drawn and I found that in interpreting the laws in question, that unless the Buildings 3, 4, 5 and 6 are used for a much more exclusive sense for growing and storage, that they will be denied the exemption provided by the statute which I am analyzing here.
Although there is no question that Buildings 1, 3, 4, 5 and 6 are essential for the growth and storage of Gasko’s Farm products, they are also used in, if not essential to the Gasko’s retail, sales, advertising and promotion. And as such, constitute sale space.
We agree and need, really, say no more. But we make some observations as to the legislative history of this statute as we are convinced it supports the Tax Court resolutions of both Van Wingerden and this case. As we have said, N.J.S.A. 54:4-23.12(a) is an exception to the general imposition of uniform property tax *400 upon real estate and the structures thereon. The legislative history suggests that the exemption was prompted by adjacent states’ treatment of similar farm structures. Our research of other nearby states’ taxation of similar structures reveals that, for the most part, reduced assessment of certain farm structures is permitted but only under narrow circumstances. Connecticut seems to have adopted the most liberal approach, providing for reduced tax valuation of agricultural or horticultural structures, including greenhouses, where “incidental sales” occur. Conn. Gen. Stat. Ann. §§ 1-1, 12-9(c).
New York, on the other hand, provides an exemption from taxation for agricultural or horticultural structures and buildings but only where such structures are “essential to the operation of agricultural and horticultural lands.” In this respect, N.Y. Real Property Tax Law § 488 (2004) provides in pertinent part:
1. Structures and buildings essential to the operation of lands actively devoted to agricultural or horticultural use and actually used and occupied to carry out such operation which are constructed or reconstructed subsequent to January first, nineteen hundred sixty-nine and prior to January first, two thousand nine shall be exempt from taxation to the extent of any increase in value thereof by reason of such construction or reconstruction for a period of ten years.
2. The term “structures and buildings” shall include: (a) structures and buddings or portions thereof used directly and exclusively in the raising and production for sale of agricultural and horticultural commodities or necessary for the storage thereof, but not structures and buildings or portions thereof used for the processing of agricultural and horticultural commodities, or the retail merchandising of such commodities____
[Emphasis added.]
See Maines v. Bd. of Assessors, Town of Lafayette, 125 A.D.2d 951, 510 N.Y.S.2d 348 (1986) (greenhouses used in commercial nursery were taxable as real property); 1 Op. Counsel SBEA No. 4, 1970 WL 11145 (N.Y. Bd. Equal. & Ass.) (“Although the growing of nursery stock falls within the definition of a ‘horticultural use’, a building used for reception, display and sale of such stock is not entitled to the farm exemption since it is primarily used for retail merchandizing rather than the raising and production for sale of a horticultural commodity.”).
*401 In 53 Pa. Con. Stat. Ann. § 8585, Pennsylvania provides for reduced tax valuation for “farmstead property” defined, in § 8582, as:
All buildings and structures on a farm not less than ten contiguous acres in area, not otherwise exempt from real property taxation or qualified for any other abatement or exclusion pursuant to any other law, that are used primarily to produce or store any farm product produced on the farm for purposes of commercial agricultural production, to house or confine any animal raised or maintained on the farm for the purpose of commercial agricultural production, to store any agricultural supply to be used on the farm in commercial agricultural production or to store any machinery or equipment used on the farm in commercial agricultural production.
[Emphasis added. See also 72 Pa. Cons.Stat. Ann. tit. 72 §§ 5490.2, 5490.4b(a).]
Rhode Island has a provision specifically governing greenhouses which provides:
A temporary greenhouse means specialized agricultural equipment having a framework covered with demountable polyurethane materials or materials of polyurethane nature and lacking a permanent and continuous foundation, which is specifically designed, constructed and used for the culture and propagation of horticultural commodities. A temporary greenhouse may include, but is not limited to, the use of heating devices, water and electrical utilities, and supporting poles embedded in non-eontinuous concrete. A temporary greenhouse by this definition is a temporary structure. A temporary greenhouse shall be exempt from property taxes.
[R.I. Gen. Laws St. § 23-27.3-109.1.3.5. (emphasis added).]
While New Hampshire provides for tax exemption for greenhouses, it does only under limited circumstances:
I. Demountable, plastic-covered greenhouses shall be exempt from taxation as provided by RSA 72:6, if all of the following qualifications are met:
(a) Removal of demountable greenhouse will not affect the utility of the underlying real estate.
(b) The demountable greenhouse is not permanently affixed to the underlying real estate with concrete or similar non-portable footings.
(c) Removal of the demountable greenhouse can be accomplished without significant damage to the greenhouse and will not render the greenhouse unfit for subsequent use as a demountable greenhouse.
(d) The demountable greenhouse is specifically designed, constructed, and used for culture, propagation, and protection of agricultural products.
(e) The demountable greenhouse is not used for the retail sale of any non-agricultural products.
[N.H. Rev. Stat. Ann. § 72:12-d (emphasis added).]
Maryland’s exemptions for agricultural or horticultural structures are even more limited they apply only to certain specified struc *402 tures. M. Code Ann., Tax-Prop. §§ 7-223 (farm implements), 8-114 (hoophouses used for agricultural purposes), 8-232 (manure banks), 8-239 (silos used for processing or storage of feed as an incidental farm operation) (2004).
Finally, and apparently most restrictive, is Delaware which requires all structures on land used for agricultural or horticultural purposes be taxed “by the same standards, methods and procedures as other taxable structures ... in the taxing district.” Del.Code Ann. tit. 9 § 8335(e) (2003). See generally, 84 C.J.S. Taxation § 105 (2001). Accord, Tuinier v. Charter Tp. of Bedford, 235 Mich.App. 663, 599 N.W.2d 116 (1999), appeal denied, 461 Mich. 1021, 611 N.W.2d 799 (2000); Green Circle Growers, Inc. v. Lorain County Bd. of Revision, 35 Ohio St.3d 38, 517 N.E. 2d 899 (1988); Saunders v. Dep’t of Revenue, 300 Or. 384, 711 P.2d 961 (1985); Hawkins v. Van Zandt County Appraisal Dist., 834 S.W.2d 619 (Tex.App.1992).
The Tax Court’s construction and application of N.J.S.A. 54:4-23.12(a), as reflected by this case and Van Wingerden, is fully consistent with the language of the statute, its legislative history and how other states have taxed similar structures. We see no basis for disturbing the Tax Court’s application of the statute to the particular facts here. Simply put, while the greenhouses at issue perform a role in the growing and production of the nursery stock, they are also an integral part of the marketing and sales of that stock and are used as such. They do not perform a single horticultural use and their space is used for sales activities that are more than merely incidental to growing and production.
Affirmed substantially for the reasons set forth by Judge Joseph C. Small, P.J.T.C., in his March 4, 2002, oral decision.