868 A.2d 1022

TOWNSHIP OF MONROE, PLAINTIFF–RESPONDENT,
v. WILLIAM W. GASKO AND MARIE GASKO,
DEFENDANTS–APPELLANTS.

WILLIAM W. GASKO AND MARIE GASKO, PLAINTIFFS–
APPELLANTS, v. TOWNSHIP OF MONROE, DEFEN-
DANT–RESPONDENT (THREE CASES).

Argued January 19, 2005—Decided March 17, 2005.

*Anthony J. Sposaro,* argued the cause for appellants.

*Richard A. Rafanello,* argued the cause for respondent (*Shain, Schaffer & Rafanello,* attorneys; *Mr. Rafanello* and *Marguerite M. Schaffer,* of counsel; *Ms. Schaffer, Roy S. Gutterman* and *John R. Bailey,* on the briefs).

Justice LaVECCHIA delivered the opinion of the Court.

This appeal involves the construction and application of the Farmland Assessment Act (Act), *N.J.S.A.* 54:4–23.1 to –23.24. Specifically, we are asked to review whether plaintiffs were properly denied a farmland assessment for temporary greenhouses because various activities associated with retail sales took place within those structures, rendering them ineligible for the benefi-

cial tax treatment. The Tax Court and the Appellate Division upheld the denial on the basis that *N.J.S.A.* 54:4–23.12(a) exempts a temporary greenhouse from the assessment when the structure "enclose[s] a space within its walls used for housing, shelter, or working, office or sales space." We granted certification, *Township of Monroe v. Gasko*, 181 *N.J.* 545, 859 *A.*2d 690 (2004), and now hold that the lower courts were overly restrictive in their application of the exemption.

I.

The Gasko Family Farm (Gasko Farm) is a seventy-one acre tract of land located in Monroe Township. There are seven structures on the property, five of which were originally involved in this appeal—(greenhouses 1, 3, 4, 5, and 6)—and two others— (greenhouse 2 and another building)—which never were a matter of dispute between the parties. The greenhouses are temporary, plastic-covered structures used for planting and cultivating plant material. The public is invited into all but greenhouse 2 several times a year for the purpose of selecting plants for purchase.

Greenhouse 1 is the only greenhouse containing an area dedicated exclusively for sales transactions. It houses cash registers, checkout counters, and posted signs displaying prices. The majority of the plants sold through retail purchase are selected from displays located in greenhouse 1. All purchases are consummated in greenhouse 1. As plants are purchased from greenhouse 1, employees replenish the floral displays by bringing forward plant stock from greenhouses 3 through 6. The Gaskos no longer dispute in this appeal that greenhouse 1 contains "sales space" and that, therefore, it is ineligible for farmland assessment status. Thus, only the nature of the activities that occur in greenhouses 3 through 6 are concerned here and whether those activities render the structures ineligible to receive the beneficial tax treatment of farmland assessment.

Greenhouses 3 through 6, as the Tax Court noted, do not contain any of the obvious sales spaces present in greenhouse 1

and appear to be fully utilized for growing plants. They are equipped with a sophisticated irrigation system and an extensive array of conveyor belts that are not present in greenhouse 1. Those systems facilitate the watering of and access to the extensive plant stock grown in the structures. Both systems are in operation throughout the year and their use is not altered in any way during those times that the structures may be entered by non-employees. Thus, persons venturing into greenhouses 3 through 6 during the selling periods in which the greenhouses are open to the public may get wet when the automatic irrigation system activates. The planting and spacing of plants and the general layout of the greenhouses are designed to make maximum use of the available space in the greenhouses for growing efficiency, including the use of benches, floors, and hanging overhead baskets. The plants are arranged to promote plant growth, not for sales display or otherwise for presentation enhancement.

The Gasko Farm is open to the public approximately three times a year. According to the record, retail sales are the primary source of the Gaskos' revenue. There is a spring selling period, during which seasonal flowering plants and bedding plants are sold. A fall selling period begins in late August and runs through the middle of October. Most sales during that period occur outside of the greenhouses. The greenhouses open to the public again shortly before Thanksgiving and remain open through mid-December. There is also a short selling period in relation to Valentine's Day. In total, the Gasko Farm is open to the public for approximately twenty weeks per year, although the greatest volume of sales occurs in the spring.

During selling times, approximately 125 carts are available in greenhouse 1 for customer use when selecting plant material. The Gaskos do not employ distinct sales staff during those periods when the public is invited in, although the fifteen or so regular farm and greenhouse employees, mostly family members, also assist with sales. The Gaskos maintain a parking lot that can accommodate approximately thirty-five to forty vehicles and an

overflow parking lot that can accommodate approximately one hundred and fifty additional vehicles. At times, off-duty police officers are hired in order to direct traffic and maintain order during peak sales periods. The Gaskos advertise their business in local newspapers and maintain signage on their farm.

The Gaskos received a farmland tax exemption for the greenhouses beginning in the 1980s, when they were erected, through 1998. In 1998, a new municipal tax assessor determined that the greenhouses did not qualify for farmland assessment because, in his view, they contained disqualifying "sales space" under *N.J.S.A.* 54:23–12. The farmland assessment designation was significant to both the Gaskos and the municipality. In 1998, without the benefit of the farmland assessment, the Gasko Farm's tax assessment rose to $649,200. The Gaskos successfully appealed to the Middlesex County Board of Taxation (Tax Board), which reduced the tax assessment to $539,500. The Township of Monroe (Township) appealed the Tax Board's decision to the Tax Court.

In 1999, the Township's tax assessor again found that the greenhouses did not qualify for farmland assessment and the Gaskos again appealed. This time, the Tax Board affirmed the assessment and the Gaskos appealed to the Tax Court. The Gaskos also filed appeals with the Tax Board for their 2000, 2001, and 2002 tax assessments. Each year the Tax Board affirmed the higher assessment without prejudice to the Gaskos' appeal to the Tax Court.

The Tax Court consolidated the appeals for years 1998 through 2001. The only issue was whether the greenhouses contained disqualifying sales space or, stated differently, whether the greenhouses could be deemed to be single-use structures for purposes of entitlement to the farmland assessment. Valuation issues were reserved.[1] The Tax Court rendered an oral decision finding that all of the greenhouses originally at issue in this appeal—green-

---

[1] Ultimately, the parties resolved the valuation issues under a stipulation of settlement filed with the Tax Court.

houses 1, 3, 4, 5, and 6—contained sales space and, therefore, were disqualified from receiving a farmland assessment.

The Appellate Division upheld the Tax Court judgment, finding that the Gaskos' marketing and sales activities affected all of the greenhouses and was not restricted to greenhouse 1. *Tp. of Monroe v. Gasko*, 21 *N.J.Tax.* 391, 402 (App.Div. 2004). According to the panel, those activities destroyed the "single-use" nature of greenhouses 3 through 6 and required the loss of farmland assessments for those structures. *Ibid.* The panel suggested that if the public was barred from entering the temporary greenhouses, the structures could regain their eligibility for the beneficial farmland assessment. *Id.* at 399.

## II.

Farming has long been an important industry in New Jersey. Despite our growing population and burgeoning industrial base, the State's association with farming is deeply rooted. Our State Seal, designed and presented by Pierre Eugene du Simitiere in May 1777 to the Legislature, honors the state's agricultural tradition by depicting three plows at its center. *See Fitzgerald's Legislative Manual,* 12 (Skender–Strauss Associates, ed., 2004) (noting also supporting female figure of Ceres, Roman goddess of grain, symbolizing abundance and "hold[ing] a cornucopia filled with harvested produce"). Since the nineteenth century, New Jersey has been known as the "Garden State" because of its agriculture. *See* V Proceedings of the State of New Jersey Constitutional Convention of 1947: Committee on the Executive, Militia and Civil Officers 146–47 (1953) (hereinafter referred to as *Proceedings*).

The Farmland Assessment Act was authorized by constitutional amendment for the purpose of preserving New Jersey's disappearing farmland. *N.J. Const.* art. VIII, sec. 1, para. 1; *Hovbilt, Inc. v. Tp. of Howell,* 138 *N.J.* 598, 619, 651 *A.2d* 77, 88 (1994) (citing *Urban Farms, Inc. v. Tp. of Wayne,* 159 *N.J.Super.* 61, 67, 386

*A.*2d 1357, 1360 (App.Div.1978)).[2] The legislative purpose is effectuated through the creation of a property tax scheme favorable to farmland, which is granted a lower tax assessment based on its value as agricultural or horticultural land. *N.J.S.A.* 54:4–23.2. The Act provides favorable tax treatment to farmland, but only to some farm buildings. *N.J.S.A.* 54:4–23.12 requires buildings on farms to be assessed at regular tax rates, except for "single-use agricultural or horticultural facilities," which are defined as

> property employed in farming operations and commonly used for either storage or growing, which is designed or constructed so as to be readily dismantled and is of a type which can be marketed or sold separately from the farmland and buildings and shall include, but not be limited to, temporary demountable plastic covered framework made up of portable parts with no permanent understructures or related apparatus, commonly known as seed starting plastic greenhouses, or other readily dismantled silos, greenhouses, grain bins, manure handling equipment, and impoundments, but shall not include a structure that encloses a space within its walls used for housing, shelter, or working, office or sales space, whether or not removable.
>
> [*N.J.S.A.* 54:4–23.12(a).]

It is undisputed that the Gasko Farm property is entitled to farmland tax assessment and that its temporary greenhouses are of the type that ordinarily would qualify as "single use agricultural or horticultural facilities" under the Act. At issue, is whether retail sales-related activity occurring in fully utilized growing greenhouses requires the loss of farmland assessments for those structures, regardless of whether that sales-related activity affects the physical arrangement or use of the buildings, or occurs in any particular physical space dedicated to a "sales" purpose. Although it is well settled that exemptions from the general property tax scheme will be construed against exemption, and that the party claiming exemption must bear the burden of proof demonstrating entitlement to the exemption, *Princeton Univ. Press v. Borough of*

---

[2] "Other benefits such as the maintenance of open spaces and the preservation of the beauty of the countryside, although incidental to the principal objective, were also significant factors in the passage of the amendment." *Hovbilt, supra,* 138 *N.J.* at 619, 651 *A.*2d at 88 (citing *Tp. of Andover v. Kymer,* 140 *N.J.Super.* 399, 404, 356 *A.*2d 418, 420 (App.Div.1976); *Galloway Tp. v. Petkevis,* 2 *N.J.Tax* 85, 91 (1980)).

*Princeton,* 35 *N.J.* 209, 214, 172 *A.2d* 420, 422–23 (1961), those principles do not prevent our conclusion that the decisions below were overly restrictive in their application of *N.J.S.A.* 54:4–23.12(a)'s exemption.

## III.

It goes without saying that farming and sales of farm products go hand in hand. As noted, New Jersey long has been known for the agricultural uses to which its land has been put. And, the State as a whole has benefited from the agricultural products that its farmland has generated for sale. Indeed, it is to be expected that farmland would be used to generate profits for its owners.[3] In the past, those profits constituted a considerable portion of our economy, as was highlighted by George Tierney, representing seven preeminent agricultural organizations at the time of the Constitutional Convention of 1947.

> [I]n 1916 the value of [New Jersey's] farm products totaled $60,000,000. [In 1946] they were up to $265,000,000. The State is the first among the 48 states in the amount of wheat, corn and some other vegetables grown.... All that is for the benefit of all the people of the State of New Jersey.
>
> * * *
>
> Agriculture with its various ramifications constitutes the largest industry in the State; that includes food packing and all the other activities necessary to deliver more than $600,000,000 worth of farm products. It is a large industry.
>
> [V Proceedings at 143–44.]

Now, however, less of the state's land is used for farming. The Farmland Assessment Act was authorized to stem the conversion of farmland to other uses by assisting the farmers who remain to cope with the modern farming requirements. Thus, the

---

3 The Concessions and Agreements of the Proprietors of East Jersey provided for the division of land into lots and specified the manner in which the land was to be conveyed by the State to individual owners. That conveyance of land, "[a]ll which being done according to those instrucc'ons Wee hereby declare that the same shall be effectuall in Law for the enjoyment of the said Plantation and all the benefits and profits of and in the same."

Act recognized that its salutary purpose would be served by granting certain buildings farmland assessment status.

The Act excludes from the farmland assessment those temporary greenhouses that "enclose[ ] a space within [their] walls used for ... office or sales space." *N.J.S.A.* 54:4–23.12(a). However, in giving sense to that provision, one must not ignore that the Act overall does not discourage sales in connection with agricultural and horticultural activity. Indeed, the opposite inference prevails in that the Act, by its own terms, contemplates "sales" activity as the natural consequence of farming activity. The Act defines "agricultural use" as land "devoted to the production for sale of plants and animals useful to man." *N.J.S.A.* 54:23.3. Implementing regulations equate the notion of being "devoted to agricultural or horticultural use,"[4] in pertinent part, with "[l]and on which crops are grown for market, either retail or wholesale." *N.J.A.C.* 18:15–6.2 (*see N.J.S.A.* 54:4–23.5).

It would be counter-intuitive to encourage agricultural and horticultural activities without concomitantly embracing their logical conclusion: the ultimate sale or distribution of the farm products produced. Therefore, it cannot be that temporary greenhouses are disqualified from farmland tax assessment because some sales-related activities, which culminate in sales consummated elsewhere, may occur within the greenhouses without causing any deviation from the full-scale growing operation that takes place there. Rather, if the growing operation fully utilizes the greenhouses and no adjustments are made specifically to address marketing or retail concerns, the greenhouses should not be regarded as "sales space" within the contemplation of the Act merely because members of the public are allowed in to view, choose, and remove plants. "Sales space" perforce requires some-

---

[4] *N.J.S.A.* 54:4–23.12(b) grants the Director of the Division of Taxation in consultation with the Secretary of Agriculture and in conformity with the Administrative Procedure Act, the authority to adopt rules and regulations setting forth criteria for assessing farm structures.

thing more than incidental sales-related activities that do not alter the essential growing-operations activities going on in a working greenhouse.

The only prior case to address *N.J.S.A.* 54:4–23.12(a) in a similar setting is *Van Wingerden v. Lafayette Township*, in which the Appellate Division, relying substantially on the factual findings and legal analysis set forth by the Tax Court below, allowed a farmland assessment for a temporary greenhouse growing operation notwithstanding a contention that disqualifying "other" activities were taking place in the structure. 18 *N.J.Tax* 81 (1999), *aff'd*, 335 *N.J.Super.* 560, 763 *A*.2d 294 (App.Div.2000). *Van Wingerden* stands for the proposition that use of an identifiable area of a greenhouse for preparation of horticultural products for wholesale sales, and as storage for customer pick-up, constitutes an integrated part of the growing operation occurring in the greenhouse. *See Van Wingerden, supra,* 18 *N.J.Tax* at 93 (noting that although "[s]ales do occur in the greenhouse, [ ] *N.J.S.A.* 54:4–23.12(a) prohibits sales space, not the sales themselves"). Therefore, the Tax Court in *Van Wingerden* correctly interpreted *N.J.S.A.* 54:4–23.12(a) to mean that "sale in or from a structure, otherwise qualifying for exemption, of agricultural or horticultural crops does not, in itself, preclude qualification for exemption, and the structure will lose such qualification only if it encloses 'sales space' as meant by the statute." 18 *N.J.Tax* at 90. No such dedicated space for sales was present in the greenhouse in *Van Wingerden.* The incidental plant preparation and storage activities occurring within its confines were part of the operations of the wholesale sales plant production and shipping. The result reached in *Van Wingerden* is consistent with our conclusion in this matter that the incidental sales-related activities that take place within greenhouses 3 through 6 does not alter the fully utilized growing operation that takes place within them.

Moreover, to the extent that *Van Wingerden* held that the Act denies farmland assessment status to greenhouses that contain an "enclose[d] sales space" that breaches the notion of an

integrated, single-use facility used for agricultural or horticultural purposes, we agree. In this context, we understand the term "enclosed" in its commonsense meaning, that is, to encompass a clearly demarked area readily identifiable for confining sales transactions to that location, by which the single purpose nature of the structure is lost.

■ The Gaskos have ceased pursuing a farmland assessment for greenhouse 1 for good reason: greenhouse 1 contains cash registers, a checkout area, and posted prices of plants and serves the dual function of growing or cultivating plants and providing for point-of-sale transactions involving all of the Gaskos' greenhouse plants. Greenhouse 1, as we understand it from this record, clearly contains enclosed "sales space" and, therefore, does not constitute a "single-use agricultural or horticultural facility" as required for farmland assessment treatment.

■ The same analysis leads to a different conclusion in respect of greenhouses 3 through 6. Those structures are used for the cultivation and growing of plants. All available space in them is used for plants and plant-growing related material. The growing operations are not stopped or altered during selling periods when the public is allowed access to these greenhouses, nor are the plants configured for the purpose of floral display. The public is allowed to enter these greenhouses only to view, examine, and select plants to be brought to greenhouse 1 for purchase. In short, the greenhouse itself is not "enclosed sales space" nor does it contain within its walls any enclosed sales space where sales are consummated through payment and preparation of the product for transport by any reasonable understanding of that phrase.

We reject the contention that somehow the intensity of sales-related activity within greenhouses 3 through 6 has altered the essential nature of those structures. Suffice it to say that to claim that what transpires in greenhouses 3 through 6 during selling periods, when they are open to the public, transforms those entire structures into "sales space" requires a suspension of logic. It is no more sales space than an entire field in which customers pick

their own apples, or Christmas trees, or pumpkins. Although the analogy is imperfect—the exemption from farmland assessment for enclosed sales space affects only temporary structures on farmland—the point remains that when such selection activities occur in the field where the product is growing, the act of product selection by a member of the public does not convert the field from land being put to an agricultural use. No money is exchanged in greenhouses 3 through 6, no pricing information is posted, and no packaging of purchased items is performed for customers. In sum, the public need not be barred from those specific structures for them to "regain" their farmland assessment. The Gaskos have carried their burden of demonstrating the eligibility of those temporary structures for the farmland assessment based on the use of those structures as presented in this record. We hold that it was error to have denied greenhouses 3, 4, 5, and 6 farmland assessment status for the tax years in dispute.

## IV.

The judgment of the Appellate Division is reversed.

*For Reversal*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA-SOTO—7.

*Opposed*—None.